Steven H. Schwartz, Esq., SBN 94637
Noel E. Macaulay, Esq., SBN 121695
SCHWARTZ & JANZEN, LLP
12100 Wilshire Blvd., Suite #1125
Los Angeles, California 90025
Tel. (310)979-4090
Fax. (310)207-3344
sschwartz@sj-law.com
Attorneys for Plaintiff Westgate Resorts, Ltd.



FILED
CLERK, U.S. DISTRICT COURT

JUN 1 2 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTGATE RESORTS, LTD. A
Florida limited partnership

      Plaintiff,

v.

LAUREN GREENFIELD, an
individual, FRANK EVERS, an
individual, GREENFIELD/EVERS
LLC dba Evergreen Pictures, a
Delaware limited liability company,
and INDEPENDENT FILM &
TELEVISION ALLIANCE, a
California corporation,

      Defendants.

CASE NO. CV13-04236-DSF
(SHx)

**COMPLAINT FOR
DECLARATORY RELIEF**

Plaintiff WESTGATE RESORTS, LTD. ("Westgate") brings this Complaint for

Declaratory Relief against Defendants LAUREN GREENFIELD ("Greenfield"),

FRANK EVERS ("Evers"), GREENFIELD/EVERS, LLC ("G/E") (collectively,

-1-

*COMPLAINT FOR DECLARATORY JUDGMENT*

"Defendants") and INDEPENDENT FILM & TELEVISION ALLIANCE ("IFTA"), and alleges the following:

## PREFACE

1.      This lawsuit stems from pending arbitration proceedings[1] that are governed by the IFTA Rules for International Arbitration.  Those rules have been applied to deny Westgate its right to seek punitive damages in the arbitration proceeding, relief which Westgate sought in the lawsuit it first filed against Defendants, before Defendants compelled Westgate to assert its claim in the IFTA arbitration forum.

2.      In or around August 2007, Greenfield approached David Siegel ("Siegel"), the president and CEO of Westgate[2], and asked him whether he would be interested in being the subject of a documentary film that she would direct and that her company, G/E, would produce.

3.      Greenfield pitched the idea of chronicling the construction of Siegel's home which is expected to be one of the largest private residences in the United States and dubbed "Versailles".  Siegel agreed to permit the filming of the documentary which took nearly four years to complete.

4.      While Greenfield originally described the film as focused on Siegel's and his wife's efforts to build their home, when the economy faltered and Siegel's business endeavors were negatively affected by the limited access to financing, the

[1] *In the Matter of the Arbitration between Westgate Resorts, Ltd., Claimant, and Lauren Greenfield, Frank Evers and Greenfield/Evers, LLC, Respondents*, IFTA Case No. 13-25.

[2] Westgate is a privately-held timeshare and development company that owns and operates twenty-seven (27) resorts around the country.

-2-

*COMPLAINT FOR DECLARATORY JUDGMENT*

film ultimately depicted the fallout of the recession and the collapse of the real estate economy. Worst yet, the film – wrongly as Westgate has vehemently maintained - portrayed the failure of Westgate, a company that markets its products to the same consumers who would see and hear about the film.

5. On November 26, 2011, four (4) years into the project, when the film was virtually complete, G/E induced Richard Siegel, David Siegel's son, to sign, for Westgate, a document entitled "Release" (the "Release").[3] A copy of the Release is attached as Exhibit "A".

6. Significant to this matter, the one page Release provides, *inter alia*, "**ARBITRATION**: All disputes under this Release shall be settled pursuant to binding arbitration under the rules of the Independent Film and Television Alliance ('IFTA'). . . ."

7. Within days of Richard Siegel's signing of the Release, the film, entitled "The Queen of Versailles", was selected to be presented at the 2012 Sundance Film Festival in Park City, Utah.

8. The press releases leading up to the movie premiere revealed that the film was no longer going to simply focus on the construction of one of America's largest homes, but rather told a "rags-to-riches-to-rags story" that portrayed Westgate as having failed, a victim of the real estate recession.

---

[3] While Westgate disputed that Richard Siegel had the authority to sign the Release on behalf of Westgate, the issue was settled in judicial proceedings in the United States District Court for the Middle District of Florida resulting in its January 2, 2013 Order (*See Westgate Resorts, Ltd. v. Lauren Greenfield, Frank Evers, and Greenfield/Evers, LLC*, Case No. 12-cv-00035-ACC-GJK, Doc. 81)

-3-

*COMPLAINT FOR DECLARATORY JUDGMENT*

9.     The false characterization of Westgate threatened to spook prospective Westgate customers who might otherwise be interested in purchasing a Westgate timeshare property, but for the inescapable, but undeniably false, impression the film left that the company had failed.

10.    To seek redress, Plaintiff filed suit for defamation and false light defamation in the United States District Court for the Middle District of Florida where (1) the majority of the film was shot, (2) Westgate's principal place of business is located and (3) the Siegels reside.  Westgate sought to recover damages and, especially, punitive damages, awardable under whatever law is deemed applicable to Westgate's claims.

11.    The District Court concluded that Westgate was required to arbitrate the dispute pursuant to the Release.[4]

12.    On or about February 26, 2013 Westgate filed its Notice of Arbitration with the IFTA which, as did its original complaint, includes a demand for punitive damages. A copy of the Notice of Arbitration is attached hereto as Exhibit "B".

13.    Leading up to the final arbitration hearing currently scheduled for July 9, 2013 in Beverly Hills, California before IFTA Arbitrator Paul D. Supnik, Arbitrator Supnik has advised the parties that he is without the power to award punitive damages, even if such damages are otherwise appropriate, meaning that Westgate will be denied the opportunity to obtain the relief it had originally sought in the District Court, before, at Defendants' instance, it was forced into arbitration.

---

[4] The Court could not and did not make any findings as to the substantive enforceability of the Release itself, and Westgate reserves all rights to challenge the enforceability of the Release on other grounds in arbitration.

COMPLAINT FOR DECLARATORY JUDGMENT

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a) because the amount in controversy in this matter exceeds $75,000.00, exclusive of interest and costs, and because the parties have diversity of citizenship.

15.     This Court has personal jurisdiction over Defendants who are individually residents of Los Angeles County and because the dispute concerning the IFTA Rules pertains to the arbitration pending in Los Angeles, California. Moreover, G/E is registered and authorized to transact business as a foreign corporation in California where it maintains its principal office in Venice, California. Finally, IFTA is a California corporation with its principal place of business in Los Angeles, California.

16.     Venue is proper under 28 U.S.C. §1391 (a), (b) and (c).

## GENERAL STATEMENT

17.     This suit invokes 28 U.S.C. §2201 and seeks a declaratory judgment that, to the extent the IFTA Rules apply to the resolution of the defamation claims pursued in the arbitration, such Rules cannot limit Westgate's ability to recover punitive damages through those proceedings where that limitation is, *inter alia*, inimical to the purpose and function of the Rules.  Such a limitation is likewise contrary to the well established principal that arbitration, as a substitute for judicial proceedings, must provide complete relief to a damaged party, and conflicts with and is thus pre-empted by the Federal Arbitration Act (9 U.S.C. §1 *et seq.*), which, given that interstate commerce is involved, is applicable to these proceedings.

*COMPLAINT FOR DECLARATORY JUDGMENT*

## THE PARTIES

18.     Westgate Resorts, Ltd. is a limited partnership formed under and pursuant to the laws of Florida with its principal place of business in Orange County, Florida. The general partner of Westgate Resorts, Ltd. is Westgate Resorts, Inc., a corporation formed under and pursuant to the laws of Florida, which likewise maintains its principal place of business in Orange County, Florida. David Siegel, a resident of Orange County, Florida and a citizen of the state of Florida, is the president and sole director of the general partner. Any and all limited partners of Westgate Resorts, Ltd. are citizens of the state of Florida.

19.     Defendant Greenfield is an individual believed to reside in Los Angeles County, California, and is, accordingly, believed to be a citizen of the state of California.

20.     Defendant Evers is an individual believed to reside in Los Angeles County, California, and is, accordingly, believed to be a citizen of the state of California.

21.     Defendant Greenfield/Evers LLC is a Delaware limited liability company, registered and authorized to transact business as a foreign corporation in the State of California, which maintains its principal office for the transaction of its business in Venice, California. G/E is known and commonly transacts business as Evergreen Pictures. Greenfield and Evers are the principals, officers and authorized agents of, and believed to be the sole members of, G/E.

22.     Defendant ITFA is a California corporation with its principal place of business in Los Angeles, California.

23.     All conditions precedent to the maintenance of the cause of action set forth herein have occurred, been waived or excused.

–6–

*COMPLAINT FOR DECLARATORY JUDGMENT*

## THE RELEASE AGREEMENT, THE IFTA RULES,
## AND THE ARBITRATOR'S INTERPRETATION OF SAME

24.     Per the Release, all disputes thereunder must be settled pursuant to binding arbitration under the IFTA Rules.[5] A copy of the IFTA Rules is attached hereto as Exhibit "C".

25.     The Release's arbitration agreement does not limit the relief that a party to the Release may seek in the obligatory arbitration proceedings, and in particular, does not preclude or otherwise restrict the recovery of punitive damages.

26.     Section 1.2 of the IFTA Rules expressly provides that:

> [i]t is the purpose of these Rules to provide the parties seeking enforcement of their rights arising under Rule 1.1 with an economical and expeditious procedure for resolving their disputes. *Any Arbitrator designated under the provision of these Rules shall be authorized to interpret these Rules broadly to the end that complete relief may be afforded to the parties* in any dispute arising hereunder.

(emphasis added).

27.     Section 8.1 of the Rules also provides broad discretion to the Arbitrator:

---

[5] The arbitration agreement in the Release is bare-bones and is silent as to the relief that may be sought in any arbitration proceeding brought as required by its terms, including, especially, whether punitive damages are available. Rather, it merely cites to the IFTA Rules as controlling.

*COMPLAINT FOR DECLARATORY JUDGMENT*

> The Arbitrator shall have all jurisdiction and powers to make rulings as to procedures for the conduct of the arbitration including, but not limited to, . . . the governing law and the arbitrability of any claims . . . which the Arbitrator deems necessary or proper to ensure the *just, expeditious, economical and final determination of all matters in dispute*."

(emphasis added)

28.     Additionally, Section 8.2 of the IFTA Rules grants powers to the arbitrator and parties that exist under California law:

> The *Arbitrator shall exercise all powers granted to commercial Arbitrators under the laws of the State of California*, USA or the laws of the jurisdiction where the arbitration shall take place, if other than in the State of California; *and the parties shall be entitled to all rights granted to arbitration participants under the laws of such jurisdictions*, including, if allowed, the right to seek and obtain a declaration of rights, injunctive or equitable relief. All arbitrations shall be conducted under, shall be subject to and shall be enforceable by the laws of the State of California, unless the parties agree otherwise in writing . . . or unless otherwise designated by the Arbitrator pursuant to Rule 13.1.[6]

(emphasis added)

---

[6] While Westgate contends that there is good cause for the Arbitrator to apply the laws of Florida to the matter under Section 13.1 of the Rules and does not waive, by filing this action, that contention in the IFTA arbitration proceeding, Florida law also contemplates awarding punitive damages in actions concerning torts. *See* Fla. Stat. Sections 768.72, 768.73 and 768.737.

COMPLAINT FOR DECLARATORY JUDGMENT

29.     California law expressly allows the recovery of punitive damages in the defamation claims Westgate has asserted here. Indeed, California's Civil Code at Section 3294(a) provides that in any action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to actual damages, may recover punitive damages for the sake of example and by way of punishing the defendant.[7]

30.     Notwithstanding that the IFTA Rules provide that California law governs and that the arbitrator is to interpret the Rules broadly so that complete relief may be afforded to the parties, and even though the Release's arbitration agreement contains no such limitation, the same Rules, at Section 8.4, state:

> Although the Arbitrator *shall be empowered to grant only compensatory and not exemplary or punitive damages,* an award nonetheless including such prohibited damages shall be valid and enforceable, but shall be deemed amended to exclude such damages. *This provision shall not preclude any party hereto from applying to a court of appropriate jurisdiction for such damages in accordance with applicable law.*

(emphasis supplied).

---

[7] At least one California Court has concluded that Section 3294 of California's Civil Code applies to arbitrations. *See Baker v. Sadick,* 162 Cal.App.3d 618 (4th DCA 1984). The *Sadick* Court also pointed out that "[a]rbitration serves as a *substitute* for proceedings in court. As a substitute, arbitration would not be encouraged by a decision which effectively holds a claim which may otherwise be asserted in a court of law may not be asserted in arbitration." *Id.* at 628. (emphasis in original)

*COMPLAINT FOR DECLARATORY JUDGMENT*

31.     In a Continued Notice of Hearing dated May 10, 2013, Arbitrator Supnik, perhaps reflecting on Section 8.4 of the Rules, noted that "the parties should be aware that even if claimant were successful and proved its claim, this tribunal does not have the power to award punitive damage even if they were found to be otherwise appropriate." A copy of the Continued Notice of Hearing dated May 10, 2013 is attached hereto as Exhibit "D".

32.     One of the primary objectives of arbitration is to effect expeditious and economical solution of disputes and Section 1.2 of the IFTA Rules quoted above expressly echoes that sentiment. Indeed, the very nature of arbitration is to remove a dispute from the courtroom setting. Thus, it is incongruous to, on the one hand, compel arbitration, yet, on the other, require that a portion of the dispute still be presented before a court. In essence, IFTA claimants seeking punitive damages would be required to try their case twice—once in arbitration and once in court—frustrating the goals of speed and efficiency.[8]

---

[8] Moreover, the IFTA Rules fail to provide guidance concerning the procedures for seeking punitive damages before a court. That is, must the party retry the entire case? Will a ruling on punitive damages be based upon the record from the arbitration? Since punitive damages require evidence of fraud, oppression, or malice (or, under Florida law, intentional misconduct, gross negligence, or recklessness)—all conduct about which witnesses must testify but who, because punitive damages are not before the arbitrator, may be denied the ability to do so as their proposed testimony is no longer relevant to an issue in dispute — would witnesses need to testify in the subsequent court proceedings (negating the rationale for and primary benefit of arbitration)?

-10-

*COMPLAINT FOR DECLARATORY JUDGMENT*

33.    The IFTA has set up an arbitration procedure that undercuts even its own announced purpose, while denying a party a form of relief justified by its arbitration claim, and then forcing that same party to later return to the court in which the case was filed originally and then forcibly extracted by Defendants' invocation of the IFTA's rules. Thus, Section 8.4 of the IFTA Rules is invalid, as its restriction on punitive damages conflicts with the parties' arbitration agreement, conflicts with the stated purpose of the IFTA Rules and conflicts with the purpose and philosophy of the Federal Arbitration Act, which is deemed to have pre-empted such rules and principles – like Section 8.4 – which undermine the federal policy favoring arbitration.[9]

## ANY AMBIGUITY IN THE TERMS OF THE ARBITRATION AGREEMENT SHOULD BE INTERPRETED IN FAVOR OF ARBITRATION

34.    The United States Supreme Court has repeatedly emphasized the goals of arbitration. Indeed, as the Court recently noted, "'[a] prime objective of an agreement to arbitrate is to achieve 'streamlined proceedings and expeditious results,'' 'which objective would be 'frustrated' by requiring a dispute to be heard by an agency first."[10]  Similarly, a rule that requires matters pertaining to claims for punitive damages to be litigated after the conclusion of arbitration hinders the same aim of speedy resolution.

---

[9]  *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S.Ct. 1212 (1995) (restraint on recovery of punitive damages invalidated).

[10] *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1749 (U.S. 2011) citing *Preston v. Ferrer*, 552 U.S. 346, 357-58 (2008).

*COMPLAINT FOR DECLARATORY JUDGMENT*

35.   The Supreme Court also recently repeated its earlier conclusion that arbitration "parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes."[11]

36.   It is with this backdrop that where there is any uncertainty in whether matters are subject to arbitration, any ambiguity should be resolved in favor of arbitration because public policy favors arbitration over litigation.[12]

37.   Thus, where express directions that the arbitrator is to broadly interpret the rules to ensure complete relief are juxtaposed against a prohibition against awarding punitive damages, the procedures employed to govern the arbitration process are hopelessly conflicted. The prohibition which denies Westgate the relief it was entitled to seek in the court case it originally filed denies Westgate the very rights it is to be assured by the Release's arbitration agreement

---

[11] *Id.* citing *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 559 U.S. 662, 130 S.Ct. 1758, 1775 (2010).

[12] Arbitration is favored as a means of settling disputes because it is expeditious and inexpensive, avoids the delays of litigation, and relieves court congestion. Arbitration thus provides a favored method for expediently and economically fully resolving disputes and thereby relieving crowded civil courts. *See Saika v. Gold*, 49 Cal.App.4th 1074 (4th Dist. 1996) (courts are to implement and give effect to arbitration proceedings where arbitration is economical, efficient, and judicially favored and where the "very essence" of arbitration is finality.); *see also*, *Wagner Const. Co. v. Pacific Mechanical Corp.*, 41 Cal. 4th 19 (2007) quoting *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street,* 35 Cal.3d 31 (1983) (there is a strong public policy for arbitration and even where there are doubts concerning the scope of arbitrable issues, they still have to be resolved in favor of arbitration.)

-12-

*COMPLAINT FOR DECLARATORY JUDGMENT*

and the compulsory arbitration process it mandated (which the Federal Arbitration Act was enacted to protect). Section 8.4 of the IFTA Rules must, therefore, be deemed invalid and unenforceable.

### FIRST CAUSE OF ACTION
**(Declaratory Relief)**

38.   Westgate realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 37 of this Complaint.

39.   A controversy has arisen concerning Arbitrator Supnik's[13] application of the IFTA Rules to this arbitration proceeding.

40.   Arbitrator Supnik has declared that the IFTA Rules prohibit an award of punitive damages through the arbitration proceedings, notwithstanding the language of the Release's arbitration agreement, the specific goals and policy considerations outlined in the Rules which direct the arbitrator to interpret them broadly, and California law which otherwise permits such an award. The Federal Arbitration Act, as the statement of a national policy favoring arbitration, pre-empts any rule or principal of law that restricts or limits the full enforceability, according to their terms, of private agreements to arbitrate, such as the Release here contains.

---

[13] Westgate intentionally omitted Arbitrator Supnik as a defendant as Section 15.1 of the IFTA Rules provides that the arbitrator is not an appropriate, necessary, or proper party in any litigation or other judicial or regulatory proceeding related in any way to the arbitration. Although the same provision mentions the IFTA, since the dispute concerns the IFTA Rules as applied to other arbitrations, its inclusion falls into the exception for "applicable provisions of law" which might otherwise necessitate its inclusion.

*COMPLAINT FOR DECLARATORY JUDGMENT*

41.     Westgate desires a judicial determination of the respective rights and obligations of the parties under the Release's arbitration agreement and the IFTA Rules. Specifically, Westgate requests a declaration that, given that the Release's arbitration agreement does not restrict the relief that may be sought or the type of damages that may be awarded and that the FAA pre-empts any rule or principal that limits the enforceability of such an arbitration agreement, the IFTA's punitive damages limitation is invalid and should be stricken. Alternatively, Westgate ask the Court to declare that the IFTA Rules be read as a whole to permit an IFTA arbitrator to award punitive damages without needlessly requiring the parties to re-litigate or otherwise present the matter in separate lawsuit before a Court.

42.     A judicial determination is necessary and appropriate at this time under the circumstances so that Westgate may avail itself of the rights to which it is entitled: the right to seek an award of punitive damages in the pending arbitration. This controversy is incapable of resolution without judicial intervention and adjudication. Accordingly, Westgate has no plain, speedy or adequate remedy at law.

## PRAYER FOR RELIEF

43.     Plaintiff prays for a declaration that Section 8.4 of the IFTA Rules is invalid and inapplicable to the arbitration proceedings between Westgate and Defendants, and that the IFTA's Rules permit Arbitrator Supnik (and all arbitrators under the IFTA Rules) to award punitive damages and that any limitation on such an award, when viewed in the context of the Federal Arbitration Act and read in conjunction with the entirety of the IFTA Rules, is not permissible; and

/ / /

/ / /

*COMPLAINT FOR DECLARATORY JUDGMENT*

44.     Plaintiff prays for such other and further relief as the Court deems just and proper.

DATED:     June 12, 2013          **SCHWARTZ & JANZEN, LLP**


_____
STEVEN H. SCHWARTZ
NOEL E. MACAULAY
Attorneys for Plaintiff
WESTGATE RESORTS, LTD.

-15-

*COMPLAINT FOR DECLARATORY JUDGMENT*

# EXHIBIT "A"

## RELEASE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, _Westgate Resorts_ ("Company"), grants to Greenfield/Evers LLP dba Evergreen Pictures ("Producer") the right to exhibit, record sound from and to photograph (the "Photography") the meetings, presentations and other company-related events described below (the "Company Activities") on the currently untitled documentary motion picture about the Siegels (the "Picture").

**PRODUCER'S RIGHTS:** All rights to the Photography will be the exclusive property of Producer and may be used in connection with the Picture or any advertising or publicity relating thereto, in any manner or media worldwide in perpetuity for all purposes.

**REPRESENTATIONS AND WARRANTIES:** Company represents and warrants that it has the right to enter into this Release and to grant Producer the rights granted herein; that the consent of no other person or entity is required for Producer's filming and use of the Company Activities; and that the Photography of the Company Activities, and any use thereof in connection with the distribution, exhibition and exploitation of the Picture or any other production, or any advertising or publicity relating thereto, will not in any way infringe or violate the rights of any person or entity, including but not limited to any person's right of privacy and right of publicity.

**RELEASE:** Company releases and discharges Producer, its employees, agents, licensees, successors and assigns from any and all claims, demands or causes of actions that Company may have for libel, defamation, invasion of privacy or right of publicity, infringement of copyright or trademark or violation of any other right arising out of or relating to any of the rights granted herein.

**INDEMNIFICATION:** Company agrees to indemnify Producer from and against any loss or damage, including reasonable attorney fees and disbursements, caused by or arising out of any breach or alleged breach of any representation made by Company herein.

**ARBITRATION:** All disputes under this Release shall be settled pursuant to binding arbitration under the rules of the Independent Film and Television Alliance ("IFTA"). The prevailing party will be entitled to reasonable attorney fees and costs.

**Description of Company Activities**

_____

_____

_____

Dated: _11/26/11_     Signature: _____

Name of Authorized Representative: _____

**EXHIBIT "A"**
**PAGE 17**

# EXHIBIT "B"

February 26, 2013

Lauren Greenfield
Frank Evers
Greenfield/Evers, LLC

c/o Martin Garbus
Eaton Van Winkle
3 Park Ave.
New York, NY 11016

(VIA CERTIFIED MAIL and EMAIL)

Re:   **Notice of Arbitration**

    In accordance with Rule 2 of the Independent Film & Television Alliance Rules for International Arbitration ("Rules"), Claimant hereby notifies Respondents and the Independent Film & Television Alliance ("IFTA") of the following:

    Pursuant to Rule 2.4.1., demand is hereby made that the dispute between Westgate Resorts, Ltd. and Greenfield/Evers, LLC d/b/a Evergreen Pictures, Lauren Greenfield and Frank Evers be referred to arbitration.

    Pursuant to Rules 2.4.2. and 2.4.3., the names, addresses, telephone, and fax numbers, if available, of the parties to this dispute and the names, addresses, telephone and fax numbers, email addresses and, if available, of the respective legal counsel are as follows:

| Claimant | Respondents |
|---|---|
| Westgate Resorts, Ltd. | Greenfield/Evers, LLC |
| 5601 Windhover Drive | Lauren Greenfield |
| Orlando, Florida 32189 | Frank Evers |
| Phone: 407-351-3351 | |
| | |
| Claimant's Counsel | Respondent's counsel |
| Michael Marder, Esq. | Martin Garbus, Esq. |
| Kate Saft, Esq. | Joseph Johnson, Esq. |
| Greenspoon Marder, P.A. | Eaton & Van Winkle LLP |
| 201 E. Pine Street, Suite 500 | 3 Park Ave. |
| Orlando, Florida 32801 | New York, NY 11016 |
| Phone: 407-425-6559 | Phone: 212-561-3632 |
| Fax: 407-422-6583 | Fax: 212-779-9928 |
| Michael.Marder@gmlaw.com | mgarbus@evw.com |
| Kate.Saft@gmlaw.com | jjohnson@evw.com |

Richard W. Epstein, Esq.
Greenspoon Marder, P.A.
200 East Broward Boulevard, Suite 1500
Ft. Lauderdale, FL 33301
Phone: (954) 764-6660
Fax: (954) 764-4996
Richard.Epstein@gmlaw.com

**EXHIBIT "B"**
**PAGE 19**

IFTA

## NOTICE OF ARBITRATION

Phone: (954) 764-6660
Fax: (954) 764-4996
Richard.Epstein@gmlaw.com

Pursuant to Rule 2.4.4., a copy of the arbitration clause contained in the attached Release[1] is set forth below:

ARBITRATION: All disputes under this Release shall be settled pursuant to binding arbitration under the rules of the Independent Film and Television Alliance ("IFRA"). The prevailing party will be entitled to reasonable attorney fees and costs.

Pursuant to Rule 2.4.5., a copy of the Release is attached hereto as Exhibit "E".

Pursuant to Rule 2.4.6., Westgate Resorts, Ltd. sets forth a statement of the nature of the dispute and the amount involved, if any, as follows:

### General Background

1.      Westgate Resorts, Ltd. ("Westgate") is a Florida limited partnership with its principal place of business in Orange County, Florida. David Siegel, a resident of Orange County, Florida, is Westgate's president and sole director.

2.      Westgate is a privately-held timeshare and development company that owns and operates twenty-seven (27) resorts around the country.

3.      Notably, Westgate owns a ski resort in Park City, Utah which does the bulk of its business during the winter ski season each year.

4.      Westgate was thriving as of 2008, before Lehman Brothers collapsed and the global economic crisis began.

5.      As an unfortunate result of the Lehman Brothers collapse, which reverberated throughout the world financial markets, the credit and capital markets froze and Westgate's access to financing – until that time freely available to Westgate – was unforeseeably restricted. Notwithstanding the economic difficulties plaguing the nation, and although the timeshare

---

1.      Westgate disputes the validity of the Release and enforceability of the substantive provisions of the Release, including the purported release of claims, for various reasons, including but not limited to, lack of consideration and lack of mutuality of obligation.

2

**EXHIBIT "B"**

**PAGE 20**

IFTA

NOTICE OF ARBITRATION

industry was dramatically affected by these adverse financial conditions, Westgate's sales remained strong.

6.   During this same time frame, Westgate had undertaken to construct its largest resort: the Planet Hollywood Towers by Westgate (the "Towers") on the "Strip" in Las Vegas, Nevada.

7.   Following its commitment to this project, Westgate suffered, as did all of the real estate segment of the U.S. economy, from the fundamental change in market conditions, including, especially, the sudden unavailability of credit.

8.   Like many companies, Westgate was required to adjust to the economic conditions. This meant cutting costs and implementing efficiency measures within the company. Because of these efforts, among others, Westgate weathered the financial storm.

9.   As a key part of its plans, on November 21, 2011, Westgate sold its interest in the Towers and successfully restructured its debt.

10.  Currently, in part because of the November 2011 debt restructure, Westgate is a stable and profitable company.

## The Film and Sundance

11.  In or around August, 2007, Lauren Greenfield ("Greenfield") approached David Siegel ("Siegel"), the president and CEO of Westgate, and asked him whether he would be interested in being a subject of a documentary film (the "Film") to be directed by Greenfield and produced by Greenfield's production company, Greenfield/Evers, LLC ("G/E").

12.  As Greenfield described it, the Film would chronicle the construction of the new home Siegel was then building in Orlando, Florida, which locally became commonly known as "Versailles."

13.     Siegel agreed to permit Greenfield to shoot footage for the Film, primarily in Orange County, Florida.

14.     In connection with the Film, in August 2009, Siegel and his wife Jacqueline—the two principal subjects of the Film—both individually signed personal appearance releases. These two documents were generic ostensibly industry standard appearance releases, specifically pertaining to and limited to the Siegels' own participation and depiction in the Film. Such releases, given that they specifically related to and were limited to the Film itself, were a not unexpected condition to the Siegels participation in the Film and Respondents' production of it. Those two releases, in contrast to the purported Westgate Release which is the subject of this claim, were reasonably supported by consideration and anticipated a mutuality of both obligation and performance wholly missing from the Release Respondents now seek to enforce against Westgate.

15.     Ultimately, the Film was completed around four (4) years later.

16.     Although the primary focus of the Film was always to be the construction of Siegel's future residence not Westgate's timeshare resorts, as the country's economic climate changed, so did the vision of the Film. As Westgate's business was adversely impacted by the collapse of the financial market, Greenfield increasingly portrayed the personal effect that had on Siegel and his family. For context, Greenfield filmed some of the business operations conducted at the timeshare resorts that comprise Westgate. So, throughout the four (4) year filming process, Westgate frequently provided Greenfield and her Film crew with rooms at Westgate's various resorts throughout country, and Siegel even accommodated Greenfield and her Film crew at his current personal residence in Orlando.

17.     The last time Greenfield and her Film crew visited Siegel in his personal home and stayed at Westgate's resorts was from November 26, 2011 to November 28, 2011.

**EXHIBIT "B"**
**PAGE 22**

IFTA
NOTICE OF ARBITRATION

18.     During this visit Greenfield spent hours at Siegel's home and was the beneficiary of his hospitality both at his current residence and as a guest at a Westgate resort.  During this last visit Siegel informed Greenfield that Westgate had resolved its financial issues and was once again highly profitable. Indeed, this fact was obvious to Greenfield given the festive mood in Siegel's home and the fact she was once again provided with free accommodations.  At no time during this visit did Greenfield ever mention Sundance Institute, Inc. ("Sundance") or the 2012 Sundance Film Festival (the "Festival") or, especially, that she had submitted the film for consideration by the Sundance jury.

19.     A mere two (2) days later, on November 30, 2011, Siegel learned that the Film was selected for the Festival and was scheduled to be shown at the Festival on opening night, January 19, 2012 in Park City, Utah—the same city where Westgate owns and operates its ski resort.

20.     At this same time, Sundance, in collaboration with Respondents and/or with Respondents' authorization and/or acquiescence, issued a press release describing the Film as follows:

> *Queen of Versailles* follows billionaires David and Jacqueline Siegel and their attempts to build the biggest house in America (affectionately dubbed "Versailles") – a 90,000 sq foot palace just outside of Orlando, which features 23 bathrooms, 13 bedrooms, 10 kitchens and three pools.
>
> When the global banking crisis hits, however, *the timeshare tycoon and his socialite wife are forced to sell off the unfinished property or face economic ruin.*
>
> . . .
>
> With the economy still struggling, *Versailles* offers an insight into the belt-tightening being undertaken at the upper end of the socioeconomic spectrum, and – judging by last year's IDFA trailer – the film has plenty of potential for slightly absurd comic relief.

**EXHIBIT "B"**
**PAGE 23**

IFTA
NOTICE OF ARBITRATION

The Queen of Versailles / U.S. (Director:  Lauren Greenfield) –
Jackie and David were triumphantly constructing the biggest house
in America – a sprawling 90,000 square-foot palace inspired by
Versailles – *when their timeshare empire collapses and their
house is foreclosed. Their rags-to-riches-to rags story* reveals the
innate virtues and flaws of the American Dream. (the "Original
Sundance Description") (emphasis supplied).

A true and correct copy of the Original Sundance Description is attached hereto as **Exhibit "A."**

21.     The Original Sundance Description contains the following false and defamatory

statements:

      a.  the timeshare tycoon and his socialite wife are forced to sell off the unfinished
          property or face economic ruin;
      b.  their timeshare "empire" collapses;
      c.  their house is foreclosed; and
      d.  rags-to-riches-to rags story.

22.     Taken individually and collectively the statements above portray Siegel and

Westgate as essentially broke and out of business.

23.     Indeed, contrary to this description, the actual facts were that Siegel's "timeshare

empire" never collapsed and he was never "forced to sell Versailles or face economic ruin."

24.     The use of the words "collapse" and "economic ruin" falsely indicated that Siegel

and Westgate had failed financially, which they clearly have not. To the contrary, although

having sold its interest in Planet Hollywood Towers by Westgate, Westgate continues to own

and successfully operate its remaining 27 resorts.

25.     The phrase "rags-to-riches-to-rags" clearly and falsely portrays Siegel himself,

and given his ownership of Westgate, Westgate itself as currently broke and financially destitute,

which was not the case when such descriptions were published, given that Westgate, at that time,

was profitable and was financially stable.

26.     Upon learning of the false and defamatory statements in the Original Sundance

Description, Siegel immediately contacted Greenfield to address these statements. A true and

**EXHIBIT "B"**
**PAGE 24**

correct copy of correspondence sent to Greenfield on December 1, 2011 is attached hereto as **Exhibit "B."**

27.    Greenfield and her husband Evers—who is the executive producer of the Film— agreed with Siegel, for themselves and for G/E, that the Sundance Description was false and that they would be taking all necessary steps to correct it.

28.    Greenfield's and Evers', individually and for G/E, promises went unfulfilled as the Original Sundance Description had at such time already been transmitted to various media outlets and appeared all over the Internet, something Westgate believes Respondents well knew when they made such promises.

29.    Eventually the Original Sundance Description was revised to state:

> Jackie and David were triumphantly constructing the biggest house in America – a sprawling, 90,000-square-foot palace inspired by Versailles – when their timeshare empire falters due to the economic crisis. Their rags-to-riches-to-rags story reveals the innate virtues and flaws of the American Dream." (the "Revised Sundance Description").

A true and correct copy of the Revised Sundance Description is attached hereto as **Exhibit "C."** However, this revision of the Original Sundance Description could not correct the false statements already rampant because of, among other things, the virus-like distribution of the Original Sundance Description throughout the Internet.

30.    As late as December 30, 2011, after a month's notice to Greenfield, Evers and G/E that the Original Sundance Description was false and defamatory, a portion of the Original Sundance Description had saturated the Internet, appearing in over 12,000 websites including most glaringly on Respondents' own website. A true and correct copy of a screenshot from Respondents' website on December 30, 2011 is attached hereto as **Exhibit "D."**

31.    Even though they knew that the truth and facts of the highlighted text below were to the contrary, Respondents' website continued to state as of December 30, 2011:

**EXHIBIT "B"**
**PAGE 25**

> Jackie and David were triumphantly constructing the biggest house in America – a sprawling, 90,000-square-foot palace inspired by Versailles – *when their timeshare empire collapses and their house is foreclosed*. Their *rags-to-riches-to-rags story* reveals the innate virtues and flaws of the American Dream. *(e.s.)*

*See* Exhibit "D."

32.     Therefore, even though Greenfield, Evers and G/E were on notice of the false and defamatory statements in the Original Sundance Description, they continued to publish the false and defamatory statements on Greenfield's own personal website at least as late as December 30, 2011.

33.     Thereafter, amidst the pervasively disseminated false portrayal of Siegel and Westgate in both the Original Sundance Description and the Revised Sundance Description, which Respondents exploited for their collective economic gain, Respondents premiered the Film at Sundance on January 19, 2012.

34.     It was not until April 14, 2012, Siegel was able to see the film for the first time.

35.     In addition to the false and malicious press releases, the Film falsely depicts Westgate in an array of defamatory, derogatory and damaging ways too numerous to enumerate here, but which includes, among others, as (a) failing to pay its bills to the contractor that built the Towers giving the viewer the false impression that Westgate does not pay its bills (indeed the Film fails to disclose that the contractor's claims are disputed and Westgate has an affirmative claim against its contractor for over $40 million dollars); (b) being compelled to layoff its workforce because of, specifically, the Towers' contractor's claims (events which, despite this false portrayal, were not at all connected); and (c) essentially broke and out of business, on the verge of bankruptcy. Westgate has demanded that steps be taken to correct the false and defamatory impressions created about Westgate's financial status; however, Respondents,

IFTA
NOTICE OF ARBITRATION

knowing that the perceived salaciousness of the Film and the false impression it gives of the ruin of members of the financial elite enhanced its appeal and marketability to the demographics to which Respondents, with their new found distributor, have targeted the Film, have flatly refused.

### COUNT I
### DEFAMATION
### (as to the statements in the Original and Revised Sundance Descriptions)

36.     Westgate realleges each of the allegations set forth in paragraphs 1 through 35 *supra*, as though fully set forth herein.

37.     This is an action for damages against Respondents Greenfield, Evers and G/E for defamation.

38.     From on or around November 30, 2011 until the present, Respondents have published certain defamatory statements concerning Westgate's financial condition to the general public via the Internet and other media, including specifically via Respondents' own website.

39.     In so doing, Respondents have made false statements to those who have accessed such websites and viewed the other forms of media which leave the impression that Westgate has collapsed financially and is otherwise in a state of financial ruin.

40.     Upon being notified of the false statements on or around December 1, 2011, Respondents did not stop, but instead continued to publish the false statements on Respondents' own website at least as late as December 30, 2011 evidencing Respondents' actual malice and reckless disregard for the truth.

41.     The statements excerpted in paragraphs 20, 29 and 31 above were false and intended to degrade and injure Westgate in its good will, credit and reputation, and has exposed Westgate to distrust in the financial dealings and ridicule in the markets in which it conducts its business.

IFTA
NOTICE OF ARBITRATION

42.   The above statements, and the economic depiction which the statements create about Westgate, are false, malicious, and defamatory and published in complete disregard to their obviously harmful effect of Westgate's reputation and good standing in the community.

43.   Further, not only were the above statements false, misleading and defamatory, but they were made maliciously intending to injure Westgate for the purpose of promoting the Film for Respondents' financial gain.

44.   As a result of the defamatory statements, Westgate has been injured in its good name, credit and reputation.

## COUNT II
## DEFAMATION – FALSE LIGHT
### (as to Westgate's portrayal in the Film)

45.   Westgate realleges each of the allegations set forth in paragraphs 1 through 35 and paragraphs 38 through 40 of Count I *supra*, as though fully set forth herein.

46.   This is an action for damages against Respondents Greenfield, Evers and G/E arising from the false and defamatory portrayal of Westgate in the Film.

47.   With the release of the Film on January 19, 2012 at Sundance, and with each subsequent showing of the Film, Respondents have published certain false and defamatory statements concerning Westgate's financial welfare to the general public and falsely portrayed Westgate via the Film.

48.   In so doing, Respondents have, for their own financial gain, falsely portrayed Westgate to the viewers of the Film, purposely giving the viewer the impression that Westgate has collapsed financially and is otherwise in a state of financial ruin.

49.   Despite being notified of the false portrayal of Westgate in the pre-release marketing on or around December 1, 2011, and knowing that the Film itself perpetuates in greatly more detail the same false impressions, Respondents, for their financial gain, released the

EXHIBIT "B"
PAGE 28

IFTA
NOTICE OF ARBITRATION

Film at Sundance and, through a distribution agreement they have reached, have and will continue to show the Film, evidencing Respondents' actual malice and reckless disregard for the truth.

50.     Beyond Respondents' purposeful false portrayal in the Film of Westgate's financial condition, Respondents has likewise falsely depicted the Film as a "documentary", when in fact, unbeknownst to Respondents' intended audience, the Film is a staged, theatrical production, albeit using non-professionals in the starring roles (as themselves) rather than professional actors. Such a scheme was designed by Respondents to give the Film's viewers the false impression that what is portrayed on-screen was reality when it was really a theatrical production, more fictional than real. The Film's construct as a reputed "documentary", predicated as it is on this inherent deception, is to give credence and a perception of truth to its contents, exacerbating the harm generated by the Film's false portrayal of Westgate's financial condition.

51.     The illustrative (but by no means exhaustive) enumeration of matters depicted in the Film summarized in paragraph 35 above were false and intended to degrade and injure Westgate and its good will, credit and reputation, and have exposed Westgate to distrust and ridicule.

52.     The above statements, and the economic depiction which the statements create about Westgate, are false, malicious, and defamatory and published via the Film in complete disregard to their obviously harmful effect of Westgate's reputation and good standing in the community; and these false statements and depiction of Westgate's financial condition are continuing in nature.

**EXHIBIT "B"**
**PAGE 29**

IFTA
NOTICE OF ARBITRATION

53.     Further, not only were the above statements in the Film false, misleading and defamatory, but they were made maliciously intended to injure Westgate for Respondents' own financial gain.

54.     Indeed, upon information and belief, Respondents have entered into agreements with Magnolia Pictures and the Bravo Network and intent to pursue a distribution of the Film domestically and internationally, with full knowledge that the Film falsely depicts Westgate's financial status.

55.     As a result of the defamatory statements in the Film, Westgate has been injured in its good name, credit and reputation.

## COUNT III
## ACTION FOR DECLARATORY RELIEF

61.     Westgate realleges each of the allegations set forth in paragraphs 1 through 35 *supra*, as though fully set forth herein.

62.     This is an action for declaratory relief.

63.     Richard Siegel is the son of David Siegel.

64.     Richard Siegel is engaged in sales and marketing activities on behalf of Westgate Marketing LLC, an entity separate and distinct from Westgate Resorts, Ltd. and is neither an officer, director or employee of Westgate Resorts, Ltd. or its general partner, Westgate Resorts, Inc.

65.     Attached as Exhibit "E" is a document Greenfield presented to Richard Siegel in November, 2011, when the Film was essentially complete and when the Release was unneeded for any legitimate purpose related to the ongoing production of the Film, and asked that he sign. At that time, Richard Siegel and his wife were vacationing in New York City over the 2011 Thanksgiving weekend. The document, as Greenfield presented it to Richard Siegel, consisted of only the type-written text; the underscored portions at or near the top and bottom of the page

12

**EXHIBIT "B"**
**PAGE 30**

IFTA
NOTICE OF ARBITRATION

were completely blank and uncompleted. Richard Siegel signed his name to the document. But, when Richard Siegel did so, the hand-written name "Westgate Resorts" (not in Richard Siegel's hand) did not appear in the underscored space on the document's second line, nor was Richard Siegel's signature accompanied, then or now, by any descriptor of status or capacity. Nor did Greenfield ever inform Richard Siegel that she was asking that he sign this document for or on behalf of Westgate or in any capacity other than as an individual appearing in the Film. Nonetheless, Respondents now portray this document as a release of, among other things, the claims that Westgate asserts in this notice of arbitration.

66.     Respondents, during the more than four (4) years they took to create and complete the Film, throughout the hundreds of days they spent in residence in David Siegel's home and in Westgate's resorts, never asked for nor discussed with David Siegel a release for or on behalf of Westgate. In particular, the execution of the document – Exhibit "E" – Respondents presently characterize as such a release is not the knowing, voluntary or effective waiver of any right by Westgate.

67.     The Release is invalid because it was given without consideration (as, among other things, the film, at the time the Release was signed, was virtually completed and in no way was Westgate's future participation in the Film needed or even significant) and lacked mutuality of obligation. Indeed, it appears that Greenfield's November 2011 visit to Richard Siegel in New York was no more than a pretext to illegitimately and belatedly procure the Release without David Siegel's knowledge, so as to protect Respondents from the expected consequences of their portrayal of Westgate in the Film in a fashion that they knew was defamatory.

68.     Tellingly, Siegel and his wife Jacqueline signed personal releases on or around August, 2009—over two years before the Release was presented to Richard Siegel for signature.

IFTA
NOTICE OF ARBITRATION

The gap in time between those routine, fully expected releases, and the belated, unexpected release that Richard Siegel signed in November 2011 underscores the invalidity of the Release.

69. The Respondents have asserted and are likely to continue to assert the validity of Exhibit "E" as releasing and operating as a bar of Westgate's claims. Westgate, as the foregoing makes apparent, vehemently disagrees, disputing the validity and enforceability of Exhibit "E".

70. There is, accordingly, a judiciable and bona fide dispute about what Exhibit "E" is purported to be, about the validity of any release of claims Exhibit "E" purports to effectuate and whether Exhibit "E" operates as an enforceable agreement against Westgate Resorts, Ltd.

## RELIEF SOUGHT

Pursuant to Rule 2.4.7., the relief or remedy sought by Westgate is as follows:

(a)     For compensatory, incidental and consequential damages;

(b)     For punitive damages;

(c)     To declare the rights and legal relations of Westgate and Respondents in connection with Exhibit "E";

(d)     To declare that Exhibit "E" is not a release by and is otherwise non operative and not binding on Westgate; and

(c)     For Attorneys' Fees and Costs; and

(d)     Any other relief the Panel deems just and proper.

## Caveat and Reservation

The foregoing is not intended nor shall it be construed as a complete recitation of the facts and events concerning the above-referenced matter, nor shall it be construed as a waiver of any rights, remedies or claims, legal or equitable, which Westgate Resorts, Ltd. may have.


Sincerely,

Greenspoon Marder, P.A.
Attorneys for Westgate Resorts, Ltd.

cc:     IFTA Arbitral Agent-- rstarkey@ifta-online.org

**EXHIBIT "B"**
**PAGE 32**

2010, the United States announced construction of the first new nuclear power plant in more than 32 years. A year later, a 9.0 magnitude earthquake struck the Fukushima Power Plant in Japan sparking a fierce debate in the U.S. over the safety and viability of nuclear power.

*Chasing Ice* / U.S. (Director: Jeff Orlowski) — Science, spectacle and human passion mix in this stunningly cinematic portrait as National Geographic photographer James Balog captures time-lapse photography of glaciers over several years providing tangible visual evidence of climate change.

*DETROPIA* /U.S. (Directors: Heidi Ewing, Rachel Grady) — The woes of Detroit are emblematic of the collapse of the U.S. manufacturing base. This is the dramatic story of a city and its people who refuse to leave the building, even as the flames are rising.

*ESCAPE FIRE: The Fight to Rescue American Healthcare* / U.S. (Directors: Matthew Heineman, Susan Froemke) — What can be done to save our broken medical system? Powerful forces are trying to maintain the status quo in a profit-driven medical industry, but a movement to bring innovative methods of prevention and healing is finally gaining ground — potentially saving the health of a nation.

*Finding North* /U.S. (Directors: Lori Silverbush, Kristi Jacobson) — A crisis of hunger looms in America and is not limited to the poverty stricken and uneducated. Can a return to policies of the 1970s save our future?

*The House I Live In* / U.S. (Director: Eugene Jarecki) — For over 40 years, the War on Drugs has accounted for 45 million arrests, made America the world's largest jailer and damaged poor communities at home and abroad. Yet, drugs are cheaper, purer and more available today than ever. Where did we go wrong and what is the path toward healing?

*How to Survive a Plague* / U.S. (Director: David France) — The untold story of the intensive efforts that turned AIDS into a manageable condition — and the improbable group of (mostly HIV-positive) young men and women whose amazing resilience broke through a time of rampant death and political indifference.

*The Invisible War* / U.S. (Director: Kirby Dick) — An investigative and powerfully emotional examination of the epidemic of rape of soldiers within the U.S. military, the institutions that cover up its existence and the profound personal and social consequences that arise from it.

*Marina Abramović The Artist is Present* / U.S. (Director: Matthew Akers) — Marina Abramović prepares for a major retrospective of her work at The Museum of Modern Art in New York hoping to finally silence four decades of skeptics who proclaim: 'But why is this art?'

*ME at the ZOO* / U.S. (Directors: Chris Moukarbel, Valerie Veatch) — With 270 million hits to date, Chris Crocker, an uncanny young video blogger from small town Tennessee, is considered the Internet's first rebel folk hero and at the same time one of its most controversial personalities.

*The Other Dream Team* / Lithuania, U.S. (Director: Marius Markevicius) — The 1992 Lithuanian National Basketball Team went from the clutches of Communism to the Summer Olympics in Barcelona — a testament to the powerful role of sports as a catalyst for cultural identity.

 *The Queen of Versailles* / U.S. (Director: Lauren Greenfield) — Jackie and David were triumphantly constructing the biggest house in America — a sprawling, 90,000-square-foot palace inspired by Versailles — when their timeshare empire collapses and their house is foreclosed. Their rags-to-riches-to-rags story reveals the innate virtues and flaws of the American Dream. **(DAY ONE FILM)** 

*Slavery By Another Name* / U.S. (Director: Sam Pollard) — As slavery came to an end

**EXHIBIT
"A"**



**GreenspoonMarder**
ATTORNEYS AT LAW

888.491.1120
www.gmlaw.com

From the desk of:
Michael E. Marder, Esq.
Capital Plaza I, Suite 500
201 East Pine Street
Orlando, Florida 32801-2718
Phone: 407.425.6559
Fax: 407.422.6583
Direct Fax: 407.563.9653
Email: michael.marder@gmlaw.com

December 1, 2011

*VIA ELECTRONIC MAIL, CERTIFIED MAIL AND FACSIMILE*

Ms. Lauren Greenfield
c/o Chelsea Pictures
1040 N. Las Palmas Av., Bld. 15
Los Angeles, CA 90038
Telephone: (323) 860-8030
Facsimile: (323) 860-8035
aamon@chelsea.com

Re:        Queen of Versailles

Dear Ms. Greenfield:

The undersigned firm represents the interests of David and Jacqueline Siegel (hereinafter the "Siegels"). It has recently come to our attention that you are releasing the film *Queen of Versailles* (the "Film") at the Sundance Film Festival in 2012. Based upon the attached summaries, the Film depicts the Siegels as being "forced to sell off the unfinished property or face economic ruin" when "their timeshare empire collapses and their house is foreclosed" and contains "plenty of potential for slightly absurd comic relief". Such statements constitute unlawful defamation and the tort of false light. Specifically, the Siegels have not faced financial ruin and in fact, still retain ownership interest of their house.

As you are aware, the Film was intended to be a documentary on the construction of the largest home in America. The Film was not intended to be a comedic satire of the Siegels, their family and their lifestyle. I understand the Siegels have been more than hospitable toward you during the filming process. In fact, as recently as last week, they entertained you in their home and you made no mention of the Film's content or satirical nature as depicted on the attached summary.

As a result of the foregoing, demand is hereby made that you permit the Siegels to view the Film prior to its release and prior to any additional press or previews released by you or your production company. In addition, demand is hereby made that you immediately remove any defamatory or unlawful content from the Film. Please confirm your compliance with these demands within five (5) days of the date of this letter, otherwise be advised that the Siegels will

---

Fort Lauderdale | Orlando | Aventura | Boca Raton | West Palm Beach | Stuart | Tallahassee

**EXHIBIT "B"**
**PAGE 34**

**EXHIBIT "B"**

Ms. Lauren Greenfield
December 1, 2011
Page No. 2

have no choice but to seek immediate legal relief against you, including but not limited to, the filing of a lawsuit for defamation and false light.

I trust my clients' position with respect to this matter is clear and that we can count on your immediate cooperation.

*Please govern yourself accordingly.*

Very truly yours,

GREENSPOON MARDER, P.A.

Michael E. Marder, Esq.
For the Firm

Enclosure as stated

MEM/ts

CC:    Mr. David A. Siegel

7486129 v1

Exclusive: Sundance 2012 documentaries preview » Realscreen          http://realscreen.com/2011/11/29/exclusive-sundance-2012-docs-pre...

his 2007 effort *Up the Yangtze*, and eyes will be keenly trained on him to see how his follow-up fares. Already onboard are a host of international TV nets including Japan's NHK, Finland's YLE, the UK's Channel 4 and Germany's ZDF-Arte, and with the 2012 Olympics approaching, the doc is well-timed.

### Queen of Versailles



Director: Lauren Greenfield (pictured above). Producer: Danielle Renfrew

(World premiere)

**What it's about:** *Queen of Versailles* follows billionaires David and Jacqueline Siegel and their attempts to build the biggest house in America (affectionately dubbed 'Versailles') – a 90,000 sq foot palace just outside Orlando, which features 23 bathrooms, 13 bedrooms, 10 kitchens and three pools.

When the global banking crisis hits, however, the timeshare tycoon and his socialite wife are forced to sell off the unfinished property or face economic ruin.

**Why it's hot:** The BBC-backed project was pitched at the IDFA Forum in Amsterdam in November 2010 to much interest from the assembled international commissioners. Greenfield's previous docs, *kids + money* and *Thin* (the latter of which played in competition at Sundance in 2006), were both broadcast by HBO, and she is considered a promising talent in the non-fiction space.

With the economy still struggling, *Versailles* offers an insight into the belt-tightening being undertaken at the upper end of the socioeconomic spectrum, and – judging by last year's IDFA trailer – the film has plenty of potential for slightly absurd comic relief.

### 5 Broken Cameras

Directors: Emad Burnat and Guy Davidi

EXHIBIT "B"
PAGE 36

2010, the United States announced construction of the first new nuclear power plant in more than 32 years. A year later, a 9.0 magnitude earthquake struck the Fukushima Power Plant in Japan sparking a fierce debate in the U.S. over the safety and viability of nuclear power.

*Chasing Ice* / U.S. (Director: Jeff Orlowski) — Science, spectacle and human passion mix in this stunningly cinematic portrait as National Geographic photographer James Balog captures time-lapse photography of glaciers over several years providing tangible visual evidence of climate change.

*DETROPIA* /U.S. (Directors: Heidi Ewing, Rachel Grady) — The woes of Detroit are emblematic of the collapse of the U.S. manufacturing base. This is the dramatic story of a city and its people who refuse to leave the building, even as the flames are rising.

*ESCAPE FIRE: The Fight to Rescue American Healthcare* / U.S. (Directors: Matthew Heineman, Susan Froemke) — What can be done to save our broken medical system? Powerful forces are trying to maintain the status quo in a profit-driven medical industry, but a movement to bring innovative methods of prevention and healing is finally gaining ground – potentially saving the health of a nation.

*Finding North* /U.S. (Directors: Lori Silverbush, Kristi Jacobson) — A crisis of hunger looms in America and is not limited to the poverty stricken and uneducated. Can a return to policies of the 1970s save our future?

*The House I Live In* / U.S. (Director: Eugene Jarecki) — For over 40 years, the War on Drugs has accounted for 45 million arrests, made America the world's largest jailer and damaged poor communities at home and abroad. Yet, drugs are cheaper, purer and more available today than ever. Where did we go wrong and what is the path toward healing?

*How to Survive a Plague* / U.S. (Director: David France) — The untold story of the intensive efforts that turned AIDS into a manageable condition – and the improbable group of (mostly HIV-positive) young men and women whose amazing resilience broke through a time of rampant death and political indifference.

*The Invisible War* / U.S. (Director: Kirby Dick) — An investigative and powerfully emotional examination of the epidemic of rape of soldiers within the U.S. military, the institutions that cover up its existence and the profound personal and social consequences that arise from it.

*Marina Abramović The Artist is Present* / U.S. (Director: Matthew Akers) — Marina Abramović prepares for a major retrospective of her work at The Museum of Modern Art in New York hoping to finally silence four decades of skeptics who proclaim: 'But why is this art?'

*ME at the ZOO* / U.S. (Directors: Chris Moukarbel, Valerie Veatch) — With 270 million hits to date, Chris Crocker, an uncanny young video blogger from small town Tennessee, is considered the Internet's first rebel folk hero and at the same time one of its most controversial personalities.

*The Other Dream Team* / Lithuania, U.S. (Director: Marius Markevicius) — The 1992 Lithuanian National Basketball Team went from the clutches of Communism to the Summer Olympics in Barcelona – a testament to the powerful role of sports as a catalyst for cultural identity.

 *The Queen of Versailles* / U.S. (Director: Lauren Greenfield) — Jackie and David were triumphantly constructing the biggest house in America – a sprawling, 90,000-square-foot palace inspired by Versailles – when their timeshare empire collapses and their house is foreclosed. Their rags-to-riches-to-rags story reveals the innate virtues and flaws of the American Dream. **(DAY ONE FILM)** 

*Slavery By Another Name* / U.S. (Director: Sam Pollard) — As slavery came to an end

**EXHIBIT "B"**
**PAGE 37**

*The House I Live In* / U.S.A. (Director: Eugene Jarecki) — For over 40 years, the War on Drugs has accounted for 45 million arrests, made America the world's largest jailer and damaged poor communities at home and abroad. Yet, drugs are cheaper, purer and more available today than ever. Where did we go wrong and what is the path toward healing?

*How to Survive a Plague* / U.S.A. (Director: David France) — The untold story of the intensive efforts that turned AIDS into a manageable condition – and the improbable group of (mostly HIV-positive) young men and women whose amazing resilience broke through a time of rampant death and political indifference.

*The Invisible War* / U.S.A. (Director: Kirby Dick) — An investigative and powerfully emotional examination of the epidemic of rape of soldiers within the U.S. military, the institutions that cover up its existence and the profound personal and social consequences that arise from it.

*Love Free or Die* / U.S.A. (Director: Macky Alston) — One man whose two defining passions are in conflict: An openly gay bishop refuses to leave the Church or the man he loves.

### Marina Abramovi

*The Artist is Present* / U.S.A. (Director: Matthew Akers) — Marina Abramovi prepares for a major retrospective of her work at The Museum of Modern Art in New York hoping to finally silence four decades of skeptics who proclaim: 'But why is this art?'

*ME @ the ZOO* / U.S.A. (Directors: Chris Moukarbel, Valerie Veatch) — With 270 million hits to date, Chris Crocker, an uncanny young video blogger from small town Tennessee, is considered the Internet's first rebel folk hero and at the same time one of its most controversial personalities.

*The Other Dream Team* / Lithuania, U.S.A. (Director: Marius Markevicius) — The 1992 Lithuanian National Basketball Team went from the clutches of Communism to the Summer Olympics in Barcelona – a testament to the powerful role of sports as a catalyst for cultural identity.

*The Queen of Versailles* / U.S.A. (Director: Lauren Greenfield) — Jackie and David were triumphantly constructing the biggest house in America – a sprawling, 90,000-square-foot palace inspired by Versailles – when their timeshare empire falters due to the economic crisis. Their rags-to-riches-to-rags story reveals the innate virtues and flaws of the American Dream. **DAY ONE FILM**

**EXHIBIT "B"**
**PAGE 38**



## 2012

*********

## 2012 Sundance Film Festival Announces Films in Competition

**U.S. DOCUMENTARY COMPETITION**
The world premieres of 16 American documentary films.

*The Queen of Versailles* / U.S.A. (Director: Lauren Greenfield) — Jackie and David were triumphantly constructing the biggest house in America – a sprawling, 90,000-square-foot palace inspired by Versailles – when their timeshare empire collapses and their house is foreclosed. Their rags-to-riches-to-rags story reveals the innate virtues and flaws of the American Dream. DAY ONE FILM

*****************

A speaking engagement with Lauren Greenfield

University of South Carolina Upstate

Tuesday February 28th, 2012

******************

A Closer Look Lecture with Lauren Greenfield
University of Saint Francis, Fort Wayne IN
Thursday March 1, 2012  7:30pm - North Campus AuditoriumA Closer Look Lecture with Lauren Greenfield
University of Saint Francis, Fort Wayne IN
Thursday March 1, 2012  7:30pm - North Campus Auditorium

******************

+++++++++++++++++++++++++++++++++++++++++++++++++++++++++

## Past Events 2011

"Beauty CULTure
Lauren is the Featured Artist and Director of the Documentary short being screened every 45 minutes"
Date:  May 21 to November 27, 2011
Location: The Annenberg Space for Photography
2000 Avenue of the Stars #10
Los Angeles, CA 90067

*******

PhotoPlus 2011 (New York)
Union College * Schenectady, New York
Thursday, October 27th 2011
Lauren will speak at Alumni Symposium: "Representing the Human Body: Past, Present and Future"

**EXHIBIT "B"
PAGE 39**

12/30/2011 1:02 PM

**EXHIBIT
"D"**

## RELEASE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, ___Westgate    Resorts___ ("Company"), grants to Greenfield/Evers LLP dba Evergreen Pictures ("Producer") the right to exhibit, record sound from and to photograph (the "Photography") the meetings, presentations and other company-related events described below (the "Company Activities") on the currently untitled documentary motion picture about the Siegels (the "Picture").

**PRODUCER'S RIGHTS:** All rights to the Photography will be the exclusive property of Producer and may be used in connection with the Picture or any advertising or publicity relating thereto, in any manner or media worldwide in perpetuity for all purposes.

**REPRESENTATIONS AND WARRANTIES:** Company represents and warrants that it has the right to enter into this Release and to grant Producer the rights granted herein; that the consent of no other person or entity is required for Producer's filming and use of the Company Activities; and that the Photography of the Company Activities, and any use thereof in connection with the distribution, exhibition and exploitation of the Picture or any other production, or any advertising or publicity relating thereto, will not in any way infringe or violate the rights of any person or entity, including but not limited to any person's right of privacy and right of publicity.

**RELEASE:** Company releases and discharges Producer, its employees, agents, licensees, successors and assigns from any and all claims, demands or causes of actions that Company may have for libel, defamation, invasion of privacy or right of publicity, infringement of copyright or trademark or violation of any other right arising out of or relating to any of the rights granted herein.

**INDEMNIFICATION:** Company agrees to indemnify Producer from and against any loss or damage, including reasonable attorney fees and disbursements, caused by or arising out of any breach or alleged breach of any representation made by Company herein.

**ARBITRATION:** All disputes under this Release shall be settled pursuant to binding arbitration under the rules of the Independent Film and Television Alliance ("IFTA"). The prevailing party will be entitled to reasonable attorney fees and costs.

**Description of Company Activities**

_____

_____

_____


Dated: _11/26/11_    Signature: 

Name of Authorized Representative: _____

## EXHIBIT "B"
## PAGE 40

# EXHIBIT "C"



# Independent ■
# Film & Television
# ■ ■ ■ Alliance

### RULES FOR
### INTERNATIONAL
### ARBITRATION

### V:010112

# INDEPENDENT FILM & TELEVISION ALLIANCE® RULES FOR INTERNATIONAL ARBITRATION

## INDEX

| SECTION | | PAGE |
|---|---|---|
| 0. | Prior Rules | 1 |
| 1. | General Provisions | 1 |
| 2. | The Request for Arbitration | 2 |
| 3. | The Administering Agency | 3 |
| 4. | The Panel of Arbitrators | 4 |
| 5. | Representation and Assistance | 4 |
| 6. | Appointment of the Arbitrator | 4 |
| 7. | Location of Arbitration | 6 |
| 8. | Jurisdiction and Procedure in the Arbitration | 6 |
| 9. | Meetings and Hearings | 8 |
| 10. | Interim Measures of Protection | 9 |
| 11. | Default | 10 |
| 12. | The Award | 10 |
| 13. | Applicable Law | 11 |
| 14. | Costs | 11 |
| 15. | Waiver of Claims Against Alliance and Others | 12 |
| 16. | Miscellaneous Provisions | 13 |

**As of January 1, 2012**

INDEPENDENT FILM & TELEVISION ALLIANCE®
10850 Wilshire Blvd., 9th Floor
Los Angeles, CA 90024

TEL: 310/446-1000
FAX: 310/446-1600
www.ifta-online.org

**Copyright 2012 Independent Film & Television Alliance® All Rights Reserved.**

## INDEPENDENT FILM & TELEVISION ALLIANCE®
## RULES FOR
## INTERNATIONAL ARBITRATION
### As of January 1, 2012

0.    Prior Rules.

0.1.    The Independent Film & Television Alliance ("Alliance" or "IFTA") was formerly known as AFMA and the American Film Marketing Association.

0.2    These Independent Film & Television Alliance Rules for International Arbitration were formerly known as the AFMA Rules for International Arbitration or the American Film Marketing Association Rules for International Arbitration ("IFTA Rules" or "Rules").  Where appropriate, any contract referring to the AFMA Rules for International Arbitration or the American Film Marketing Association Rules for International Arbitration shall be deemed to refer to the applicable version of the IFTA Rules.

1.    General Provisions.

1.1    These Rules shall govern:

1.1.1  Any dispute submitted to arbitration under these Rules by agreement of the parties or involving the interpretation or enforcement of an agreement which designates these Rules as the controlling rules for the enforcement of the rights of the parties under any such agreement, any defense or counterclaim thereto.

1.1.2  An "affiliate" of a member for purposes of these Rules is an entity that (i) owns or controls the member; or (ii) is owned or controlled by a member; or (iii) is owned or controlled by an entity which is an affiliate of a member.  For purposes of this Rule 1.1.2, "owned by" means ownership of the shares of stock or other evidence of ownership in an amount exceeding fifty percent (50%), and "controlled by" means that the company has the authority to determine the business decisions of another.

1.2    It is the purpose of these Rules to provide the parties seeking enforcement of their rights arising under Rule 1.1 with an economical and expeditious procedure for resolving their disputes.  Any Arbitrator designated under the provisions of these Rules shall be authorized to interpret these Rules broadly to the end that complete relief may be afforded to the parties in any dispute arising hereunder.

1.3    The Alliance shall, from time to time, establish a filing fee schedule for arbitrations conducted pursuant to these Rules under these procedures ("Fee Schedule").  Filing fees are non-refundable.

EXHIBIT "C"
PAGE 44

2.      The Request for Arbitration.

2.1     The party initiating arbitration (hereinafter called "claimant") shall give to the other party (hereinafter called "respondent") formal written notice of arbitration (the "Notice of Arbitration"). Claimant shall be solely responsible for complying with applicable law regarding service of process on respondent(s) and, if required pursuant to any applicable agreements, for providing a copy of the Notice of Arbitration to third parties (*i.e.* non-parties to the arbitration). The parties waive application of the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters with regard to service of process.

2.2     Arbitration proceedings shall be deemed to commence upon receipt of the Notice of Arbitration by the Arbitral Agent as set forth in Rule 2.5.

2.3     The Notice of Arbitration (and each other communication concerning such arbitration proceedings) shall be deemed transmitted by IFTA when sent to the respondent by: (1) fax, email or other electronic communication system which provides a confirmation of receipt; (2) personal delivery; (3) registered mail (or by regular mail service if to a country which does not recognize registered mail); or (4) courier or other comparable method of delivery to the address shown for respondent in the agreement under which the arbitration is sought or to any address which the claimant has been informed by respondent or which is known to be the last known place of business, habitual residence, or the mailing address of the respondent. The Notice of Arbitration and all other notices required to be transmitted to the parties or other individuals under the provisions of these Rules shall be deemed to have been received as of actual receipt provided by proof of delivery or ten (10) days after transmittal, as defined in this Rule, whichever shall be the earlier.

2.4     The Notice of Arbitration shall contain:

2.4.1   A demand that the dispute be referred to arbitration.

2.4.2   The names, addresses, telephone numbers, fax numbers and, if available, email addresses, of the parties.

2.4.3   The names, addresses, telephone numbers, fax numbers and, if available, email addresses, of the parties' counsel or other representative.

2.4.4   A copy of the arbitration clause under which the claim arises.

2.4.5   A copy of the contract out of or in relation to which the dispute arises.

2.4.6   A statement of the nature of the dispute and the amount involved,   if any.

2.4.7   The relief or remedy sought.

2.5    A copy of the Notice of Arbitration shall be transmitted by the claimant to the Arbitral Tribunal addressed as specified in Rule 3.3 at the same time as transmittal is made to the respondent pursuant to Rule 2.1 and shall be accompanied by payment of the filing fee as required by the Fee Schedule referred to in Rule 1.3.

2.6    If a counterclaim or cross-claim is filed, it shall be transmitted by the counter-claimant or cross-claimant to the Arbitral Tribunal addressed as specified in Rule 3.3 at the same time as transmittal is made to the counter-respondent or cross-respondent and shall be accompanied by payment of the filing fee as required by the Fee Schedule referred to in Rule 1.3.

3.    <u>The Administering Agency.</u>
      ("The Arbitral Tribunal").

3.1    The Alliance, a California non-profit corporation, has designated Independent Film & Television Alliance Arbitration to be the Arbitral Tribunal for all arbitrations governed by these Rules.

3.2    The President of the Alliance shall designate an Alliance staff member (the "Arbitral Agent") to act as the supervising representative for all acts required to be performed by the Arbitral Tribunal under these Rules. The name, address, phone number and email address of the Arbitral Agent shall be provided to all parties to arbitration proceedings under these Rules and to any party contemplating arbitration proceedings hereunder.

3.3    All documents required to be filed with the Arbitral Agent under these Rules shall be forwarded to the Arbitral Tribunal c/o The Arbitral Agent at 10850 Wilshire Boulevard, Ninth Floor, Los Angeles, California 90024, U.S.A., or such other address which may be designated from time to time by the Alliance Board of Directors.

3.4    The Arbitral Agent shall do all acts and carry out all responsibilities set forth in these Rules for the Arbitral Agent and all additional acts reasonably required for the efficient administration of these arbitration procedures including, but not limited to, the appointment of the Arbitrator as provided in Rule 6 hereafter.

3.5    No party or its representative shall have any ex parte communication with the Arbitrator. Copies of all written communications transmitted to the Arbitrator and to any party shall at the same time be filed with the Arbitral Agent. The official record of the arbitration shall be maintained by the Arbitral Agent.

3.6    Prior to the appointment of the Arbitrator, the Arbitral Agent may make such decisions regarding procedural matters as may be required from time to time under these Rules. After the appointment of the Arbitrator, notices of all such matters shall be forwarded to the Arbitrator (with copy to the Arbitral Agent) for decision and the Arbitrator shall make such decision. The Arbitral Agent shall forward notice of all such decisions to the parties.

3.7     In extraordinary circumstances and in the interests of justice, the Arbitral Agent (or the Arbitrator after his/her appointment) may extend any time period designated in these Rules but only where the Arbitral Agent is satisfied that the request for extension of time is not for the purpose of delaying the proceedings.

4.     The Panel of Arbitrators.

4.1     A panel of Arbitrators composed of lawyers qualified by experience to deal in matters relating to the entertainment industry shall be established by the Alliance.  Arbitrators hereunder shall be appointed from among the members of the panel unless to do so is impractical under these Rules.  In the latter event, the Arbitral Agent shall appoint Arbitrators similarly qualified by experience from outside the panel.

4.2     The panel shall be composed of active lawyers licensed to practice law from various countries throughout the world.  Arbitrators may be added to or removed from the panel from time to time at IFTA's sole discretion.

4.3     The composition of the panel shall be updated not less frequently than once each year.  A list containing the names, addresses, business and professional affiliates and brief personal resumes of the members of the panel shall be made available to all parties desiring to utilize the IFTA Rules or parties to contracts utilizing an Independent Film & Television Alliance arbitration clause or any arbitration clause in any prior name of the Alliance (e.g., AFMA, American Film Marketing Association) on the public website of the Alliance or upon request delivered to the Alliance.

4.4     Any Arbitrators appointed to act under these Rules shall be and remain at all times wholly independent and impartial and shall not act as advocate for any party in connection with the subject arbitration.

5.     Representation and Assistance.

5.1     Each party may be represented in the arbitration by counsel or other representative. The name and address of any representative must be communicated in writing to the other party and to the Arbitral Agent as soon as such selection has been made.

5.2     After such representative has been designated by a party, further communications to any party shall include at all times a copy of such communication directed to such counsel or other representative.   The transmittal of a copy to the representative shall not relieve the communicating party of the responsibility to also send any such notice directly to the opposing party to the proceeding.

6.     Appointment of the Arbitrator.

6.1     Promptly upon receipt of the Notice of Arbitration, the Arbitral Agent shall transmit to each of the parties (if possible by fax, email or other electronic means) a copy of the Notice of Arbitration, a copy of the IFTA Rules, and a list of not less than three (3) proposed

Arbitrators if reasonably practicable, showing the name, address and resume of each proposed Arbitrator.

6.2     Within five (5) business days of receipt of the proposed list of Arbitrators, each party shall return the list deleting therefrom any names of Arbitrators unacceptable to that party. The remaining names on the list shall be rated in numerical order showing as number one, the person most favored, number two, the person next most favored, etc.

6.3     Within seven (7) days of the receipt of the list from each of the parties or five (5) days from the last day provided for the return of the list in Rule 6.2, whichever occurs earlier, the Arbitral Agent shall designate as the Arbitrator for the dispute the person available to serve as Arbitrator who has received the most favorable acceptance on the lists returned by the parties. If two or more proposed Arbitrators receive equally favorable acceptance from all parties, then the Arbitral Agent shall designate an Arbitrator from among them. If no proposed Arbitrator receives favorable acceptance from all parties, then the Arbitral Agent shall submit a list of not less than three (3) alternate proposed Arbitrators, if reasonably practicable, to the parties for rating in accordance with Rule 6.2. The Arbitral Agent shall then designate an Arbitrator in accordance with this Rule. If no proposed Arbitrator on the alternate list receives favorable acceptance from all parties, then, in the interest of expeditious resolution of the dispute, the Arbitral Agent shall designate an Arbitrator whose name has not previously been submitted, without the necessity of resubmitting names to the parties. Each of the parties and the Arbitrator shall be promptly notified of the selection of the Arbitrator.

6.4     If any party fails to return the list as provided in Rule 6.2, the Arbitral Agent shall select as Arbitrator the person with the highest rating on the other party's list who is available to serve for the arbitration.  The exercise of discretion by the Arbitral Agent in the selection of the Arbitrator under provisions of this Rule 6 shall not be subject to challenge except as set forth in Rule 6.5 and 6.6.

6.5.     A prospective Arbitrator shall disclose to the Arbitral Agent and the parties in connection with such Arbitrator's possible appointment as Arbitrator any circumstances likely to give rise to justifiable doubt as to the Arbitrator's impartiality or independence as to the parties or the matter in dispute in accordance with the procedural law of the jurisdiction of the place of the arbitration, or, if none is specified, then the laws of the State of California.

6.6     An Arbitrator may be challenged if circumstances exist which give rise to justifiable doubt as to the Arbitrator's impartiality or independence as to the matter or parties at issue.

6.6.1     A party may challenge an Arbitrator by giving notice of his/her challenge to the other party, to the Arbitrator and to the Arbitral Agent.  Such notification shall be in writing and shall state the reasons for the challenge, and must be made within seven (7) business days after discovery of the facts on which the challenge is based, but prior to the Arbitrator's issuance of a final award or tentative final award. The Arbitral Agent may, in his/her sole discretion, suspend or continue the arbitral proceedings during the pendency of the challenge.

6.6.2   When an Arbitrator has been challenged by one party, the other party may agree to the challenge and substitution of a new Arbitrator; the Arbitrator may withdraw from his/her office as Arbitrator; or the Arbitral Agent may determine without passing on the bona fides of the grounds of challenge that a sufficient issue exists to justify the replacement of the Arbitrator and appointment of a new Arbitrator.  Removal or replacement of an Arbitrator under any of these circumstances shall not imply acknowledgment of the truth or the validity of the grounds for the challenge. If an Arbitrator is removed after an arbitration hearing, but prior to the issuance of an award, then a new hearing will be held.  If the Arbitrator has issued a final award or a tentative final award, then no removal or replacement of the Arbitrator shall take place.

6.6.3   In the event that a new Arbitrator must be appointed under Rule 6.6.2, the new Arbitrator shall be designated by the Arbitral Agent in the same manner as set forth in this Rule 6.  If a second or subsequent Arbitrator is similarly replaced, the Arbitral Agent may in the interest of expeditious resolution of the dispute designate the new Arbitrator without necessity to resubmit any list of names to the parties.

6.6.4   If the Arbitral Agent declines to exercise the option to replace the Arbitrator as referred to in Rules 6.6.2 and 9.1, the Arbitrator shall continue as the Arbitrator for the dispute and the challenge shall be deemed to have been overruled.

6.6.5   In the event of the death, incapacity, resignation, or failure or other inability of an Arbitrator to act at any time after appointment, the Arbitral Agent shall appoint a successor Arbitrator under Rule 6.6.3.

6.6.6   The Arbitral Agent, in his/her sole discretion, may remove any Arbitrator who does not comply with the provisions of Rule 9.1. If any such Arbitrator is removed, the new Arbitrator shall be designated by the Arbitral Agent in the same manner as set forth in Rule 6.

6.6.7   The Arbitral Agent's decision as to the appointment, confirmation, challenge or replacement of an Arbitrator will be final and the reasons for such decision will not be communicated.

7.   Location of Arbitration.

7.1   All arbitrations under these Rules shall take place in the forum specified by the agreement or if none, in Los Angeles County, California unless a request to designate an alternate situs is made to the Arbitrator by a party within ten (10) days of the Arbitrator's appointment by the Arbitral Agent.  If a request for an alternate situs is made, then the Arbitrator in his/her sole discretion shall determine the situs of the arbitration for the convenience of the parties and/or witnesses.  The parties, by mutual agreement, may determine that the arbitration shall take place at a different location, but such designation of an alternate location must be by mutual agreement in writing with a copy of such agreement filed with the Arbitral Tribunal prior to the selection of the Arbitrator.

8.      Jurisdiction and Procedure in the Arbitration.

8.1     The Arbitrator shall have all jurisdiction and powers to make rulings as to procedures for the conduct of the arbitration including, but not limited to, the situs of the arbitration, the governing law and the arbitrability of any claims or cross-claims which the Arbitrator deems necessary or proper to ensure the just, expeditious, economical and final determination of all matters in dispute.

8.2     The Arbitrator shall exercise all powers granted to commercial Arbitrators under the laws of the State of California, USA or the laws of the jurisdiction where the arbitration shall take place, if other than in the State of California; and the parties shall be entitled to all rights granted to arbitration participants under the laws of such jurisdictions, including, if allowed, the right to seek and obtain a declaration of rights, injunctive or other equitable relief. All arbitrations shall be conducted under, shall be subject to and shall be enforceable by the laws of the State of California, unless the parties agree otherwise in writing and transmit a copy of said written agreement to the Arbitrator and the Arbitral Agent or unless otherwise designated by the Arbitrator pursuant to Rule 13.1. The parties may apply for confirmation and/or enforcement of any arbitration award or order hereunder to the courts of the State of California or of such other state, locality, country or territory as may have jurisdiction over the parties under applicable law, Treaty or Convention.

8.3     The Arbitrator shall rule on his/her own jurisdiction, including ruling on any objections with respect to the existence or validity of the agreement of the parties to arbitrate; for that purpose, an arbitration provision which forms part of an agreement or alleged agreement of the parties shall be treated as an agreement independent of the other terms of such agreement, so that a decision by the Arbitrator that such agreement is null and void shall not entail the invalidity of such arbitration provision.

8.4     Although the Arbitrator shall be empowered to grant only compensatory and not exemplary or punitive damages, an award nonetheless including such prohibited damages shall be valid and enforceable, but shall be deemed amended to exclude such damages. This provision shall not preclude any party hereto from applying to a court of appropriate jurisdiction for such damages in accordance with applicable law.

8.5     The respondent shall transmit a statement setting forth the facts and other contentions of law on which respondent's defense is based and any counterclaim or cross-complaint and the relief claimed thereunder not later than twenty-one (21) days after receipt from the Alliance of:

        (a)     A copy of the Notice of Arbitration; and
        (b)     The IFTA Rules.

8.5.1   Respondent's statement of defense or any counterclaim or cross-complaint and the relief claimed thereunder shall be transmitted to the Arbitral Tribunal c/o the Arbitral Agent as specified in Rule 3.3 at the same time as the transmittal is made to claimant. Any counterclaim or cross-complaint shall set forth the same matters as required for the original filing of the arbitration claim under Rule 2 and shall be accompanied by payment of the filing fee as

required by the Fee Schedule referred to in Rule 1.3 and available at the Arbitration link at www.ifta-online.org or by contacting the Arbitral Agent.

8.5.2    Any response to a counterclaim or cross-complaint shall be transmitted to the Arbitral Tribunal c/o the Arbitral Agent addressed as specified in Rule 3.3 at the same time as the transmittal is made to counterclaimant or cross-claimant within fourteen (14) days of receipt from the Alliance of the counterclaim or cross-complaint and the IFTA Rules.

8.5.3    Any counterclaims or cross-complaints filed in response to a counterclaim or cross-complaint shall be accompanied by payment of the filing fee as required by the Fee Schedule referred to in Rule 1.3. The counterclaim or cross-complaint shall be transmitted to the Arbitral Tribunal c/o the Arbitral Agent addressed as specified in Rule 3.3 at the same time as the transmittal is made to counterclaimant or cross-claimant within fourteen (14) days of receipt from the Alliance of the counterclaim or cross-complaint and the IFTA Rules.

8.6    Any counter-respondent or cross-respondent may file a response to a counterclaim or cross-complaint but if none is filed, the counterclaim and/or cross-complaint shall be deemed to be denied by such counter-respondent or cross-respondent.

8.7    After submission of the statements required hereunder or in the event one party fails to file documents in a timely manner, the Arbitrator shall give the parties written direction for the further conduct of the arbitration and the parties shall be bound by such directions.

8.8    Except as provided herein, no formal discovery procedures shall be permitted under these Rules; except that the parties may by mutual agreement or on order of the Arbitrator (a) exchange lists of anticipated witnesses and/or summaries of the testimony anticipated to be elicited from each of its witnesses; (b) exchange documents or other evidence to be introduced at the hearing; (c) submit pre-hearing briefs, or any or all of the above. Additionally, in the interest of justice, the Arbitrator may permit formal depositions or other appropriate discovery of information, but such procedures shall not be permitted to delay the orderly and speedy processes of the arbitration.

9.    <u>Meetings and Hearings</u>.

9.1    The Arbitrator shall fix the date, time and place of meetings and hearings in the arbitration, and the Arbitrator shall give all parties adequate written notice thereof. In setting such dates, the Arbitrator shall give due consideration to the distance which any party to the arbitration must travel in order to be present at the arbitration proceedings. The arbitration shall be set for hearing, or submission on written materials if it is decided that no hearing is to be held, at the earliest possible date consistent with these considerations, which date shall not be later than sixty (60) days after the last response to the last claim is filed or is due to be filed with the Alliance. However, the Arbitrator may designate a later day for such proceedings for good cause, but such date shall not be later than one hundred twenty (120) days after the last response to the last claim is filed or is due to be filed with the Alliance unless the parties and the Arbitrator collectively agree to extend such date or the Arbitrator extends the date for good cause. Except in the event of the Arbitrator's delay due to the Arbitrator's disability, or other cause beyond the control of the parties, if the claimant (or counterclaimant) fails to prosecute its

claim (or counterclaim) to such hearing or submission within such applicable period, the Arbitrator shall dismiss the claim and any counterclaim or cross-complaint without prejudice. If the Arbitrator is unable, due to the Arbitrator's disability, conflicting obligations, or otherwise, to proceed as required in these Rules, upon written application of any party, the Arbitral Agent may remove the Arbitrator and recommence the procedures for selection of an Arbitrator to serve as an alternate Arbitrator. Upon the appointment of such an alternate Arbitrator, and upon written request from the Arbitral Agent, the original Arbitrator shall promptly deliver to the alternate Arbitrator or the Arbitral Agent all documents and other materials previously delivered to or lodged with the Arbitrator.

9.2     Subject to any adjournments which the Arbitrator allows, the hearing will be conducted on successive working days until it is concluded.

9.3     All meetings and hearings will be in private unless all the parties agree otherwise.

9.4     The Arbitrator shall determine the rules of procedure for the arbitration; and shall resolve any disputes as to the jurisdiction of the Arbitrator. The Arbitrator shall have sole discretion whether to allow testimony by letter or affidavit or by telephone in the presence of representatives of both parties, and establish such other reasonable rules of evidence or other procedures as may be required in any particular case to achieve justice and fairness for the parties expeditiously and at minimal cost and expense. The parties may by mutual consent, and with the approval of the Arbitrator, waive an oral hearing and submit the dispute to the Arbitrator for award on written submissions in a form and manner to be approved by the Arbitrator.

9.5     The Arbitrator shall determine the admissibility, relevance, materiality and weight of any evidence offered by either of the parties; and shall otherwise conduct the hearing in such manner as he/she deems appropriate provided the parties are treated with equality and at any stage of the proceedings each party is given a full opportunity to present its case within reasonable constraints of time as determined by the Arbitrator.

9.6     The Arbitrator may determine whether a written record shall be kept of the proceeding and shall permit the parties to submit written or oral argument in support of their respective positions.

9.7     Unless expressly agreed by the parties, the Arbitrator shall determine the language in which the arbitration is to be conducted; but, where required, reasonable provision shall be made for translations of testimony.

9.8     In arbitrations where the sums of money or the issues in dispute do not justify the expenditure of time and cost for travel to the site selected for the arbitration, either of the parties may request of the Arbitrator that the dispute be resolved without requiring a formal hearing and solely or in part by a filing of such documents and/or telephonic examination as shall be determined by the Arbitrator. The propriety of conducting the arbitrations solely or partly upon written documentation shall be determined solely in the discretion of the Arbitrator.

**EXHIBIT "C"**
**PAGE 52**

10.   Interim Measures of Protection.

10.1   The arbitration of all issues including the determination of the amount of any damages suffered by any party hereto by reason of the acts or omissions of another shall be to the exclusion of any court of law (except for court actions permitted as provided by these Rules). Arbitration hereunder shall not in any event: (i) prevent any party from seeking and obtaining interim equitable relief, including but not limited to, prohibitory or mandatory injunctions, specific performance or extraordinary writs in any court of law or equity having jurisdiction nor (ii) prevent any party from enjoining any other party in any action brought by or against a third party with respect to the subject matter of the arbitration nor (iii) prevent any party from filing legal action hereunder to effectuate any attachment or garnishment, provided that such party stipulates in such action, at any other party's request, to arbitration on the merits of the case, nor (iv) prevent a party from filing legal action to compel arbitration under the arbitration provisions hereof.

10.2   Further, at the request of any party, the Arbitrator may make interim awards and orders where necessary to safeguard the subject matter of the arbitration or effectuate the proceedings and, in this regard, may grant any remedy or relief, including but not limited to, provisional remedies and temporary injunctive relief and/or specific performance. The Arbitrator shall be entitled to require deposits or security for costs in connection with such measures.  Any interim award issued by the Arbitrator shall be entitled to the same power of enforcement in appropriate courts of law as a final arbitration award to the extent provided by law.

11.   Default.

11.1   If, after proper notice, one of the parties fails to respond to any demand by the Arbitrator for documents or other materials, or fails to appear for a hearing or in any manner fails to conform to the provisions of these Rules or any order of the Arbitrator, the Arbitrator may declare that party to be in default and make appropriate orders or interim awards to require compliance or may make a final award based upon the evidence that is before the Arbitrator at such time or may be subsequently received by the Arbitrator under formal proceedings authorized under these Rules except that no final award shall be issued in any arbitration under these Rules without the prevailing party establishing a prima facie case to the satisfaction of the Arbitrator.  However, no default shall be found after the matter has been submitted for decision solely because of a party's failure to pay the Arbitrator's fees.

12.   The Award.

12.1   The Arbitrator's award shall be made in writing and shall be signed by the Arbitrator and shall contain the date and place where the award is made.  The Arbitrator shall render his/her decision not later than forty-five (45) days after the matter has been submitted for decision.  This time period can only be extended for good cause by the Arbitral Agent.

12.2   The Arbitrator shall state the findings on which the award is based unless the parties have agreed that no findings are to be given.

EXHIBIT "C"
PAGE 53

12.3    The Arbitrator shall transmit the award to the Arbitral Agent.  Copies of the award signed by the Arbitrator shall be transmitted to the parties by the Arbitral Agent by email or fax, where such information is known, and followed by certified or registered mail, or any licensed domestic or international courier, or by any form of receipted express mail.

12.4    Within thirty (30) days after receipt of the award, either party, with notice to the other party, may request the Arbitrator to correct in the award any errors in computation, any clerical or typographical errors, or errors of similar nature.  If any corrections are made by the Arbitrator (either upon request of a party or otherwise), they must be made in writing and filed with the Arbitral Tribunal and sent to the parties within thirty (30) days of receipt of such request by the Arbitrator.

12.5    Any party may seek confirmation of and/or file or register the Arbitrator's award with a court having jurisdiction to confirm the Arbitrator's award in order to effectuate the enforcement of the award in any and all courts throughout the world.  Service of any petition, summons or other process necessary to obtain confirmation of the Arbitrator's award may be accomplished by any procedure authorized by applicable law, Treaty or Convention, except that the parties waive application of the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters with respect to service of process.

13.    Applicable Law.

13.1    The Arbitrator shall apply the laws of the State of California to all arbitrations conducted under these Rules unless the parties by mutual agreement or by the contract to be enforced provide that the Arbitrator shall apply the law of one other jurisdiction, or the Arbitrator for good cause designates another location to be the situs of the arbitration in which case the Arbitrator shall have the discretion to apply for good cause the law of the situs of the arbitration.

13.2    The final award is not subject to appeal. The parties may agree to expanded judicial review of the final award by a court of competent jurisdiction, however, in no event shall any such appeal be heard by the IFTA Arbitration Tribunal. The parties are responsible for determining whether the governing law of the agreement to arbitrate allows for such review.

14.    Costs.

14.1    The Arbitrator may allocate the costs of the arbitration in the award.  The term "costs" includes the following, but within the sole discretion of the Arbitrator as to the awarding of any specific item:

14.1.1 The fees of the Arbitrator (which shall at all times be consistent with the Fee Schedule);

14.1.2 The travel and other expenses incurred by the Arbitrator in reaching the location of the arbitration;

EXHIBIT "C"
PAGE 54

14.1.3 Actual costs of any party incurred in the prosecution or defense of the arbitration including some or all of the party's attorney's fees and costs if the Arbitrator determines it is an appropriate case for such an award.

14.2   The general principle to be applied to payment of costs shall be that the parties shall share equally the costs referred to in Rules 14.1.1 and 14.1.2; but the Arbitrator shall have the power to make an appropriate order in situations which in the sole discretion of the Arbitrator justify an unequal allocation of the costs or the bearing of all the costs by one of the parties.

14.3   At any time after the commencement of the arbitration process, the Arbitral Agent or the Arbitrator shall have the right to require each party to deposit with the Arbitral Agent or the Arbitrator an equal amount as an advance against the Arbitrator's fees.   The Arbitrator shall give formal notice of any such failure to meet the deposit requirements and the consequences of such failure.   The failure of any party to meet the deposit requirements may be deemed by the Arbitrator to be a default under Rule 11 above, unless otherwise provided by applicable law. The Arbitrator may direct the other party or parties to pay the outstanding amounts to allow the arbitration to proceed (subject to any award on costs).   If such payment is not made by claimant(s), the Arbitrator may dismiss the proceedings without prejudice. The Arbitrator may dismiss a claim or counterclaim, without prejudice, if a party fails to timely provide the full amount of the required deposit.   The Arbitral Agent shall transmit all deposits to the Arbitrator upon receipt.

14.4   Any party may challenge any fee requested by the Arbitrator by appealing to the Arbitral Agent to determine the propriety, fairness and reasonableness of the fee requested.   Such challenge must be submitted within forty-five (45) days of the transmission of the final invoice after the arbitration that is the subject of the challenge has concluded.   The party challenging the fee requested by the Arbitrator must provide specific reasons for the challenge, including the actual charges disputed, and, if applicable, supporting documentation. Such challenge shall not be served on the Arbitrator or any other party. The decision of the Arbitral Agent is final and the parties and the Arbitrator shall be bound by such decision.

15.   <u>Waiver of Claims Against Alliance and Others.</u>

15.1   The Alliance, the Arbitral Agent, and any and all Arbitrators engaged pursuant to these Rules and their agents, employees, and representatives have elected to maintain and administer these Rules and the Arbitral Tribunal hereunder (as applicable) as a service to the international entertainment community for the purpose of fostering international trade and cooperation and of avoiding prolonged and expensive international court litigation. Inasmuch as the involvement of all such parties is for such public purpose, it is in the public interest to avoid involving any such parties in disputes or claims concerning their conduct relating to arbitrations hereunder, since such disputes or claims would be likely to have a negative impact on the desire of parties to act in such public service capacities.   Accordingly, subject to the applicable provisions of the law, all parties to each arbitration brought under these Rules acknowledges, consents and agrees that the Alliance, the Arbitral Tribunal hereunder, and the officers, employees, directors, and agents of each of the foregoing, as well as the Arbitral Agent and the Arbitrator(s) utilized under these Rules, shall not be appropriate, necessary, or proper parties in any litigation or other judicial or regulatory proceeding related in any way to the arbitration; and

neither IFTA, nor its employees and agents, shall be liable for damages in any way to any party in connection with any arbitration brought or responded to under these Rules; and by accepting arbitration under these Rules, all parties hereby expressly and impliedly waive, to the extent permissible under applicable law, any and all claims or actions for money or other damages they may have now or at any time in the future against each and all of the foregoing parties relating to or in connection with arbitrations brought or responded to under these Rules, including but not limited to the Alliance's normal administration of its Rules, disqualification of the Arbitrator or any other act or omission; except that this Rule 15 shall not be deemed to include a waiver of a good faith claim which any party may have against an Arbitrator that the Arbitrator (i) shall have failed to promptly disclose to the parties such Arbitrator's known conflict of interest in a proceeding before such Arbitrator; or (ii) acted in bad faith in making an Award hereunder.

15.2    The Arbitrator shall have the immunity of a judicial officer from civil liability when acting in the capacity of Arbitrator under any statute or contract.  The immunity afforded by the Rules shall supplement, and not supplant, any otherwise applicable common law or statutory immunity.

16.  .   Miscellaneous Provisions.

16.1    In the event the parties agree on a settlement of a dispute during the arbitration proceedings, the Arbitrator shall terminate the arbitration upon written notice of a settlement by all parties and the settlement may be recorded by the Arbitrator in the form of an arbitral award made on the agreed terms if mutually requested by the parties.  If a dismissal is ordered by the Arbitrator as a result of a written notice of settlement, such dismissal should specify whether it is with or without prejudice.

16.2    Any time period or procedural requirement of these Rules may be waived or extended by the Arbitrator or, if no Arbitrator has been appointed, by the Arbitral Agent on showing of good cause therefor, except as otherwise expressly provided in these Rules.

16.3    In circumstances not specifically provided for in these Rules, the Arbitrator shall follow the rules of arbitration procedures in effect in the jurisdiction where the arbitration takes place.

16.4    These Rules shall remain in full force and effect as they may be amended from time to time by action of the Board of Directors of the Alliance.  Any amendment to these Rules shall be effective on the date approved by the Board of Directors of the Alliance.  Unless otherwise provided in the contract, the applicable Rules are the Rules in effect on the effective date of the agreement to arbitrate.

16.5    Notwithstanding anything in these Rules, in accordance with applicable law and the agreement of the parties, the Arbitrator may engage in mediation or conciliation of the dispute at any time during the arbitral proceedings for the purpose of encouraging settlement. However, if the Arbitrator acts as a mediator, such Arbitrator will be disqualified from serving as Arbitrator on that matter.

16.6    Notwithstanding any contrary provision in the parties' contract, the Alliance may in its discretion, but shall not be required to, publicize in publications originating from it, information concerning arbitrations, parties to them, and awards which are made.

EXHIBIT "C"
PAGE 57

# EXHIBIT "D"

INDEPENDENT FILM AND TELEVISION ALLIANCE

INTERNATIONAL ARBITRATION TRIBUNAL

| | |
|---|---|
| In the Matter of the Arbitration | )    #13-25 |
| | ) |
| between | )    CONTINUED NOTICE OF HEARING |
| | ) |
| Westgate Resorts, Ltd. | )    Date:  July 9, 2013 |
| Claimant, | )    Time:  9:30 A.M. |
| | ) |
| and | ) |
| | ) |
| Lauren Greenfield, Frank Evers and | ) |
| Greenfield/Evers, LLC, | ) |
| | ) |
| Respondent. | ) |
| | ) |

## CONTINUED NOTICE OF HEARING

PLEASE TAKE NOTICE that the arbitration hearing in this matter shall now take place

on **Tuesday, July 9, 2013** at the office of Paul D. Supnik, 9401 Wilshire Boulevard, Suite 1250,

Beverly Hills, California 90212, USA at 9:30 A.M. and shall continue from day to day until

completed

On May 1, 2013, I held a conference call with Richard Epstein and Kate Saft on behalf of

the claimant and Joe Johnson and Martin Garbus on behalf of defendants.  Discussed was a date

1

**EXHIBIT "D"**
**PAGE 59**

for continuing the arbitration hearing. Martin Garbus was not available for the originally
scheduled hearing date of June 5, 2013. The parties needed to check with their clients, witnesses
and calendars to confirm the availability of June 19. That date was later found to be unavailable
for respondent. Respondent suggested the date of July 9, 2013 which date was objected to by the
claimant as being too distant. Because a counterclaims was filed in connection with this matter
on April 22, 2013 the due date for responding to the counterclaim was May 8, 2013. The outside
date for the arbitration hearing in this matter absent good cause under IFTA Rule 9.1 is 60 days
thereafter or Sunday, July 7, 2013. The suggested date for the arbitration of July 9, 2013 is only
a few days later. In view the fact that no other earlier date has been suggested by the parties, and
the inability of respondent's chosen counsel to be available, I find that there is good cause to
commence the arbitration on July 9, 2013.

    The parties have indicated that may submit to me copies of testimony in the Federal
Court suit. The parties are requested to determine whether they wish to submit to me the entire
proceedings or only excerpts and the timing of my review.

    Very limited, tailored and expedited discovery may be available upon my prior approval,
but may not be used to extend the date of the arbitration hearing.

    Based on the discussion during the telephone conference, I will be viewing the film prior
to the arbitration hearing.

    By **June 11, 2013**, pursuant to Rule 8.8, the parties are to:

    (a) exchange lists of anticipated witnesses and summaries of the testimony anticipated to
be elicited from each of its witnesses;

    (b) exchange documents or other evidence to be introduced at the hearing; and

    (c) submit pre-hearing briefs.

2

**EXHIBIT "D"**
**PAGE 60**

I suspect that many if not all of the issues identified below would be dealt with by the parties in their briefs. Please brief the following issues, though the parties are not limited to these issues:

1. Choice of law. Normally choice of law issues affects contractual interpretation of contracts. Does it matter that the claims being asserted are for tort?

2. Res judicata and collateral estoppel issues.

3. Issues regarding privilege, including whether this may be affected by choice of law, and First Amendment applicability.

4. Statute of limitations, the single publication rule and first publication rule and how this may be affected by choice of law.

5. Effect of publication through the internet.

6. "Own words" in connection with defamation claims.

7. Enforceability of the release.

8. Damages available in defamation claims and causation. (the parties should be aware that even if claimant were successful and proved its claim, this tribunal does not have the power to award punitive damage even if they were found to be otherwise appropriate).

If either party intends to present testimony by telephone or by declaration, a written request with a showing of good cause should be made of the arbitrator and the opposing party by no later than **July 2, 2013**. Affidavits and letters may be introduced in evidence at the arbitration hearing if copies are submitted to the opposing party by **July 2, 2013**. Lack of live testimony may affect the weight accorded evidence rather than its admissibility.

3

**EXHIBIT "D"**
**PAGE 61**

Based on the number of witnesses identified at this time, the arbitration is expected to take about 4 to 6 days.  The parties are to advance additional arbitrator fee deposits in the sum of $20,000, half by claimant and half by respondent, thus $10,000 for each side, at least one week prior to the arbitration hearing, thus, not later than **July 2, 2013.**

Dated:  May 10, 2013

Paul D. Supnik, Arbitrator
9401 Wilshire Boulevard, Suite 1250
Beverly Hills, CA 90212
Telephone: 310-859-0100
Fax: 310-388-5645
E-Mail: paul@supnik.com

Copies sent to:

Michael Marder, Esq./Kate Saft, Esq., Greenspoon Marder, P.A -- 407-422-6583
    (michael.marder@gmlaw.com; kate.saft@gmlaw.com)
Richard Epstein, Esq., Greenspoon Marder, P.A.--954-764-4996 (Richard.epstein@gmlaw.com )
Martin Garbus, Esq./Joseph Johnson, Esq., Eaton & Van Winkle LLP -- 212-779-9928
    (mgarbus@evw.com; jjohnson@evw.com)
Kim Tommaselli, Esq., Senior Counsel, IFTA
Richonda Starkey, Arbitral Agent, IFTA

4

**EXHIBIT "D"**
**PAGE 62**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Stephen J. Hillman.

The case number on all documents filed with the Court should read as follows:

## CV13- 4236 DSF (SHx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

---

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| WESTGATE RESORTS, LTD., a Florida limited partnership | LAUREN GREENFIELD, an individual, FRANK EVERS, an individual, GREENFIELD/EVERS LLC dba Evergreen Pictures, a Delaware limited liability company, and INDEPENDENT FILM & TELEVISION ALLIANCE, a California corporation |
| **(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | **(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) |
| Steven H. Schwartz, Esquire, SBN 94637 SCHWARTZ & JANZEN, LLP, 12100 Wilshire Blvd., Suite #1125, Los Angeles, CA 90025 Telephone No.: (310)979-4090 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff
☐ 3. Federal Question (U.S. Government Not a Party)
☐ 2. U.S. Government Defendant
☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §1332, 28 U.S.C. §2201 - Declaratory judgment seeking a declaration that Section 8.4 of the IFTA Rules for International Arbitration is invalid and inapplicable to the arbitration proceedings between the parties, and that the IFTA's Rules permit all arbitrators to award punitive damages and that any limitation on such an award, when viewed in the context of the Federal Arbitration Act and read in conjunction with the entirety of the IFTA Rules, is not permissible.

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☒ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY: Case Number:**   CV13-04236

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | FLORIDA |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES COUNTY | DELAWARE |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES COUNTY | |

**\*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
**Note:** In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _~signature~_   DATE: June 12, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |